INDIANA MUNICIPAL POWER
AGENCY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Indiana Michigan Power Company,
Intervenor.

No. 93–1855.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1995.

Decided June 9, 1995.

---

Thomas C. Trauger argued the cause for petitioner. With him on the briefs were James N. Horwood, Daniel I. Davidson, Paul D. Bruner and James R. McClarnon.

Janet K. Jones, F.E.R.C., argued the cause for respondent. Jerome M. Feit, Sol., Joseph S. Davies, Jr., Deputy Sol., and Timm L. Abendroth, F.E.R.C., were on the brief for respondent.

Edward J. Brady argued the cause for intervenor. With him on the brief was Marvin I. Resnik.

Before: WALD, SILBERMAN and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge WALD.

TATEL, Circuit Judge:

The Indiana Municipal Power Agency, an association of wholesale consumers of electric power, petitions this court for review of an order of the Federal Energy Regulatory

Commission ruling that intervenor Indiana Michigan Power Company did not violate the Federal Power Act, FERC regulations, or a FERC-approved settlement agreement by including certain costs arising from its fuel supply contracts in its wholesale electricity rates. Because the Commission's decision to evaluate the reasonableness of Indiana Michigan's fuel contracts under its established prudence and market rate standards was well within its discretion, and because substantial evidence supports its findings that the coal contracts in question were priced below the weighted average price for comparable contracts and charged Indiana Michigan solely for coal, we deny the petition for review.

## I.

The Indiana Michigan Power Company, a wholly-owned subsidiary of the American Electric Power Company, provides electricity to portions of Indiana and Michigan. In the early 1970's, at the behest of American Electric, Indiana Michigan acquired substantial low-sulfur coal reserves in Utah, known as the Price River properties, anticipating that this coal would provide the American Electric subsidiaries with a reliable supply of the "clean" fuel necessary to satisfy new federal and state air quality standards. Actual demand for the Price River coal, however, fell far below American Electric's projections, resulting in significant losses for Indiana Michigan over several years.

Indiana Michigan used coal from Price River at one of its generating plants known as the Tanners Creek 1–3 facility. Several wholesale ratepayers, including members of the petitioner here, objected to Indiana Michigan's inclusion of the full price of this coal in its wholesale electricity rate, arguing that coal was available on the market at a significantly lower price and that the company was passing through the unreasonably high cost of Price River coal to its ratepayers in order to reduce its losses on Price River. In 1985, following a formal investigation by the FERC, American Electric and Indiana Michigan signed a settlement agreement with the Commission's trial staff, the "McDowell settlement." The settlement established

a ceiling on the price per ton of coal that Indiana Michigan could include in its wholesale electricity rate at Tanners Creek 1–3, thus giving Indiana Michigan an incentive to purchase coal from other suppliers at the market rate instead of continuing to use and to charge its ratepayers for the expensive Price River coal. The McDowell settlement also allowed Indiana Michigan to apply any difference between the actual price of coal used at Tanners Creek 1–3 and the price ceiling towards amortizing a portion of its investment in the Price River mines, but only up to $75 million, approximately one-third of that amortization expense. Indiana Michigan would have to recover the remaining two-thirds from another source, most likely a buyer or American Electric's shareholders. *See Indiana & Mich. Mun. Distribs. Ass'n,* 62 F.E.R.C. ¶ 61,189, at 62,228–29 [hereinafter *FERC Opinion*]. Both FERC and the Securities and Exchange Commission approved the McDowell settlement. Because the cost of the Price River coal exceeded the price ceiling in the settlement, and because Indiana Michigan apparently had no other customers for this coal, it ceased production at the Utah mines shortly after agreeing to the settlement. Although it wanted to cut its losses by selling its interest in the mines, it could not find a buyer willing to pay its breakeven asking price of approximately $150 million, the two-thirds of the amortization expense it could not recover from wholesale ratepayers. *See Indiana & Mich. Mun. Distribs. Ass'n,* 51 F.E.R.C. ¶ 63,019 at 65,083 [hereinafter *ALJ Decision*].

In 1985, Indiana Michigan finally found a serious prospect in AMAX, Inc., a corporation with mine holdings in several midwestern states. For AMAX, the Price River mines presented an opportunity to enter the western market. AMAX agreed to lease the mines for an initial period of twenty years for approximately $160 million, *FERC Opinion* at 62,229 n. 32, an amount that, together with the $75 million it was permitted to recoup from its wholesale ratepayers under the McDowell settlement, would allow Indiana Michigan to remove the mines from its books without taking a charge against earnings. At the same time, Indiana Michigan signed three contracts providing for AMAX to sup-

ply coal from its midwestern mines to three Indiana Michigan generating facilities—Tanners Creeks 1–3, Tanners Creek 4, and Breed—for periods of up to ten years. *Id.* at 62,229. The current dispute centers on these contracts.

The simultaneous closing of the long-term supply contracts and the Price River lease aroused the suspicion of petitioner Indiana Municipal Power Agency, an association of municipalities served by Indiana Michigan whose members had participated in the earlier McDowell settlement proceedings. The Power Agency filed a complaint with the Commission challenging the legality of the two AMAX coal contracts covering Tanners Creek 4 and Breed. According to the complaint, Indiana Michigan entered the long-term coal contracts in order to induce AMAX to purchase the mines at its breakeven price, a price which no other buyer had been willing to pay. Because of the interdependence of the two transactions, the Power Agency claimed that Indiana Michigan had no incentive to negotiate for the lowest possible price for the coal. To the contrary, the Power Agency surmised, the higher the price Indiana Michigan wanted AMAX to pay for the mines, the higher the price it had to agree to pay AMAX for the coal. As a result, the Power Agency claimed that the contract price for the coal contained a "premium" or a "sweetener" to offset the inflated price AMAX paid for the troubled mines.

In the initial proceedings before a FERC administrative law judge, the Power Agency contended that Indiana Michigan's passing the costs of coal under these allegedly "sweetened" contracts through to its wholesale ratepayers was unlawful on three grounds: it resulted in an unjust and unreasonable rate in violation of section 205 of the Federal Power Act; it violated FERC's cost accounting regulations that limit the costs allocable to a utility's Fuel Stock account to the invoice price of fuel and certain attendant costs; and it violated the cap established in the McDowell settlement by effectively passing through more than $75 million of the amortization of the Price River investment to the wholesale ratepayers. *See ALJ Decision* at 65,089–90. Ruling for the Power Agency

on all three grounds, the ALJ found that AMAX would not have agreed to purchase the mines without the coal contracts, and that the effect of the transaction was to shift a portion of the Price River amortization expense from Indiana Michigan's shareholders to the wholesale ratepayers at the Tanners Creek 4 and Breed facilities. In the ALJ's view, this transfer violated the terms of the McDowell settlement by imposing more than $75 million of the Price River losses on wholesale ratepayers. Violating the settlement, in turn, amounted to charging the ratepayers an unreasonable and excessive price in violation of section 205 of the Federal Power Act. *Id.* at 65,087–88. Finally, because the sweetener in the contract price covered an amortization expense associated with the Price River mines rather than the cost of the coal, the ALJ ruled that including the full cost of the contracts in its Fuel Stock account violated FERC's fuel cost accounting regulation. *Id.* at 65,089.

The FERC granted Indiana Michigan's petition for review and reversed the ALJ's decision. Instead of beginning its analysis with the McDowell settlement, the Commission ruled that the ALJ had failed to apply the appropriate legal standard under section 205 of the Federal Power Act, 16 U.S.C. § 824d (1988). *See FERC Opinion* at 62,-237–39. Analyzing the justness and reasonableness of the contracts under the framework established in its prior decisions, the Commission first examined the record to determine if the Power Agency had raised a "serious doubt" about Indiana Michigan's prudence in entering the contracts. *Id.* at 62,239. Although the Commission found nothing raising the requisite level of doubt, *id.*, it recognized that the circumstances surrounding these negotiations could foster something akin to the self-dealing existing in transactions between affiliated companies. It therefore went on to apply the more stringent market rate standard it usually employs to determine whether a fuel supply contract between a utility and an affiliated supplier is just and reasonable. *Id.* at 62,238, 62,241. Based upon a market study prepared by the Commission's trial staff, the Commission concluded that the AMAX contract prices were below the weighted average price for compa-

rable coal contracts and were therefore reasonable as required by section 205. *Id.* at 62,242, 62,244.

While the ALJ had found that the contracts included a premium to offset the loss AMAX expected to suffer on the Price River mines, the Commission concluded otherwise, noting that while the mines were a risky investment for AMAX, they were considerably more valuable to a company with the marketing and distribution networks AMAX possessed than they were to a utility like Indiana Michigan. Consequently, the Commission saw no reason to assume that AMAX had to be "induced" to purchase the mines at Indiana Michigan's breakeven price by including a premium in the coal contracts. *Id.* at 62,240. Because the contracts did not contain a premium, the Commission concluded Indiana Michigan had not violated the FERC accounting regulations. *Id.* at 62,245. Regarding the McDowell settlement, the Commission ruled that the Power Agency had not demonstrated either that it applied to the Tanners Creek 4 and Breed contracts, the only contracts challenged in its complaint, or, even if it did apply to those facilities, that the settlement had been violated, since the ratepayers were paying only for coal, not a sweetener or premium, and the price they were paying was below the average price in the market. *Id.* at 62,244–45. The Power Agency petitions this Court for review.

## II.

We begin with section 205 of the Federal Power Act, which requires that rates for "the transmission ... of electric energy subject to the jurisdiction of the Commission ... be just and reasonable." 16 U.S.C. § 824d(a) (1988). "Because 'issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission,' our review of whether a particular rate design is 'just and reasonable' is highly deferential." *Northern States Power Co. v. FERC,* 30 F.3d 177, 180 (D.C.Cir.1994) (quoting *Town of Norwood v. FERC,* 962 F.2d 20, 22 (D.C.Cir. 1992)). We are concerned only with whether the Commission has made "a reasoned deci-

sion based upon substantial evidence in the record." *Town of Norwood v. FERC,* 962 F.2d 20, 22 (D.C.Cir.1992).

Applying these standards, we conclude that the Commission was well within its discretion in rejecting the ALJ's reliance on the McDowell settlement and his finding that the contracts contained a premium as the touchstone for determining compliance with section 205. The Commission has long used its prudence and market rate tests to enforce the just and reasonable rate provision of section 205, *see, e.g., Ohio Power Co.,* 39 F.E.R.C. ¶ 61,098 (1987), and we can find no reason why it was not fully justified in relying on them in this case as well. Indeed, had petitioner limited its challenge to section 205 of the Power Act, we would look no further than the Commission's market rate analysis. Since the Commission's obligation under the Power Act is to ensure that consumers pay no more than a reasonable rate, if the market price study demonstrates that the coal contracts are reasonably priced our task is at an end, regardless of whether the contract rate includes a premium of some kind.

Our dissenting colleague takes us to task for adopting an interpretation of section 205 that, in her view, the Commission itself has not proposed. *See* Dissent at 256–257. While we agree that neither the Commission's brief nor its oral argument was entirely clear on this issue, its opinion was, and it is opinions, not oral arguments or briefs, that we review. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *North Carolina Utils. Comm'n v. FERC,* 42 F.3d 659, 663 (D.C.Cir. 1994). The Commission found that the Trial Staff's market study demonstrated that "under the comparable market price test, the prices [Indiana Michigan] paid for AMAX coal were not excessive, and thus the costs for this coal passed on to ratepayers through the Company's rates were not unjust or unreasonable." *FERC Opinion* at 62,242. The Commission went on to note that " '[t]he market test is an objective test,' " *FERC Opinion* at 62,245 (quoting *Public Service of New Mexico,* 23 F.E.R.C. ¶ 61,218 at 61,457–58 (1983)), and accordingly "if the price paid

by the utility does not exceed the market price, it does not matter what the particular components of the cost paid by the utility are. As Opinion No. 164 (*Public Service of New Mexico*) makes clear, under the market price test, a utility's fuel costs are always examined using a standard of reasonableness which allows the utility to recover the market price." *Id.*

The Power Agency, however, did not limit its challenge to section 205 of the Power Act; it also alleged that the contracts violated FERC accounting regulations and the McDowell settlement. Resolution of these claims, as we shall see in section III, does turn on whether the coal contract prices contain the alleged "sweetener." Because the Commission made its findings regarding the alleged premium in the context of its prudence analysis, we must review FERC's application of its prudence standard as well as that of its market price test.

 We thus begin, as did the Commission, with the prudence standard. It requires a complainant alleging that some aspect of a utility's rate or practice is unjust or unreasonable to present evidence sufficient to raise serious doubt that a reasonable utility manager, under the same circumstances and acting in good faith, would not have made the same decision and incurred the same costs. *New England Power Co.*, 31 F.E.R.C. ¶ 61,047, at 61,084 (1985), *aff'd sub nom. Violet v. FERC*, 800 F.2d 280 (1st Cir.1986); *Minnesota Power & Light Co.*, 11 F.E.R.C. ¶ 61,312, at 61,645 (1980). If the petitioner clears this initial hurdle, the utility has the burden of presenting evidence sufficient to dispel those doubts. *Minnesota Power & Light Co.*, 11 F.E.R.C. at 61,645. If it cannot, the complainant wins.

The Power Agency's argument that entering the AMAX coal contracts was not prudent rests on the assertion that the contracts contained a premium to compensate AMAX for purchasing the mines. The premise underlying that assertion is that AMAX did not think the mines were worth Indiana Michigan's asking price. To support this proposition, the Power Agency relied on figures taken from a management presentation to the AMAX board which included projections of the cash flow AMAX expected to receive from both the Price River mines and the coal contracts. *FERC Opinion* at 62,239. In these projections, AMAX's management had assigned a negative net present value to the mines, which, according to the Power Agency, showed that AMAX did not expect to make as much money from the mines as it was paying for them. *See* Memorandum from J.A. Olsen to AMAX Management, at 13 (September 3, 1985) [hereinafter Management Presentation] *in* Joint Appendix (J.A.) 322, at 355.

The ALJ found this evidence persuasive, but the Commission did not. Considering the projected earnings figures in the context of the whole presentation, the Commission concluded that the AMAX present value figures reflected an intentionally conservative scenario. For example, while the Price River properties contained reserves sufficient to support production for more than 35 years, the exhibit cited by petitioners included earnings for just 20 years. *Id.* Under the terms of its lease, AMAX acquired control of the Price River reserves for up to 80 years. *See* Management Presentation at 9, *in* J.A. at 331. In addition, the management presentation observed the "significant upside potential" of the properties, stating that "[p]rojected operating costs and realizations are felt to be realistic, and could be surpassed." Memorandum from J.A. Olsen to R.B. Meschke (September 26, 1985) *in* J.A. at 370, 371; Management Presentation at 4, *in* J.A. at 326. The presentation ultimately recommended that the Board go forward with the lease, anticipating that the Price River acquisition would solidify AMAX's midwest operations during periods of market uncertainty and provide an opportunity for AMAX to "diversify and expand into a new coal production area where earnings potential is sound and competitive advantage can be gained." *Id.* at 2, 14 *in* J.A. at 324, 336. On the basis of this evidence, the Commission concluded that AMAX's management believed that leasing the Price River properties at Indiana Michigan's asking price was an attractive business opportunity with an acceptable level of risk.

Petitioner pointed to other internal AMAX documents analyzing the proposed lease and the supply contracts as additional evidence that the coal contracts included a premium. These documents made frequent reference to the "margin," "net revenues," and "add ons" included in the coal supply contracts. The terms "margin" and "net revenue," the Power Agency claimed, described the premium included in the contracts to compensate AMAX for purchasing the mines at the breakeven asking price. According to the Power Agency, other documents and financial worksheets indicated that American Electric had determined how much to charge for the supply contracts based upon the amount it had to pay for the mines and that a lower price for the mines would lead to a lower contract price. *See* Brief for Petitioner at 27, 29–32.

Acknowledging that "there may have been a linkage" between the transfer of the Price River properties and the coal supply contracts, *FERC Opinion* at 62,237, the Commission observed that "AMAX's and Indiana Michigan's intentions in selecting the prices they agreed to do not establish whether the prices were just and reasonable." *Indiana & Mich. Mun. Distribs. Ass'n,* 65 F.E.R.C. ¶ 61,087 at 61,527 n. 21 [hereinafter *FERC Order Denying Rehearing* ]. Instead, the Commission relied on *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944), in which the Court stated that "[u]nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." *Id.; see FERC Order Denying Rehearing* at 61,527 n. 21. Focusing its attention on the results here, the Commission found nothing in the documents cited by the Power Agency which raised serious doubt that the contract prices were exorbitant or unreasonable. To the Commission, the final management presentation relied upon by the Power Agency to support its contention that the contract price included a premium offered another—and perfectly proper—explanation for AMAX's use of the terms "premium" and "margin." That presentation listed three figures for each of the challenged supply contracts: the "base price," the "alternative price," and the "net revenue increase."

Management Presentation at 7–8 *in* J.A. at 329–30. According to the Commission, the text surrounding these figures indicated that for the contracts in question, the "alternative price" represented AMAX's estimation of the price it would have received for the coal in question for short-term or immediate sale on the spot-market over the life of the contracts. The "net revenue increase" in the presentation, the Commission observed, was simply the difference between the long-term contract price and this estimated spot-market price. The Commission thus concluded that AMAX's use of the terms "premium" or "margin" in its other documents described nothing more than the difference between the price under the long-term contracts and the price on the spot-market. *Id.*

■ We are satisfied that the Commission's application of its prudence standard in this case is not arbitrary and is supported by substantial evidence. It " 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *City of Mesa v. FERC,* 993 F.2d 888, 895 (D.C.Cir.1993) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). This is all we require. Once assured the Commission has engaged in reasoned decisionmaking, it is not for us to reweigh the conflicting evidence or otherwise to substitute our judgment for that of the Commission. *See id.*

We are equally satisfied with the Commission's application of its market rate standard. Under that standard, the Commission gives "special scrutiny" to fuel supply contracts between a utility and its subsidiary or an affiliated company by comparing the price of the challenged contract to other contracts in the relevant market. *See Public Service Co. of New Mexico v. FERC,* 832 F.2d 1201, 1212–14 (10th Cir.1987). This comparison serves as "an objective test that prevents rate manipulation" by "provid[ing] a substitute for the arms-length negotiations that provide objectivity and fair dealing in non-affiliate transactions." *Ohio Power Co.,* 39 F.E.R.C. ¶ 61,098 at 61,279 (1987) (internal punctuation and citation omitted). Indiana

Michigan and AMAX are not affiliates. But in light of the allegations that the coal contracts here were negotiated at something less than arm's length, the Commission, after examining the contracts under the prudence standard, went on to evaluate the contracts using the market rate test.

The study prepared by the Commission's trial staff revealed that the prices in both challenged AMAX contracts were lower than the weighted average price of the comparable coal supply contracts surveyed in the two relevant markets. To the Commission, this was conclusive evidence that the AMAX contract prices were reasonable. After all, Indiana Michigan could arguably maintain that any price between the lowest and the highest comparable contract prices in each market should be deemed reasonable. The AMAX prices were not only within that high-low range but in the lower half. *See FERC Opinion* at 62,241–42. In addition, the Commission found it highly unlikely that AMAX could charge a premium on top of its bona fide costs and still provide coal at a price below the weighted average in the market. *Id.* at 62,244.

■ The Power Agency maintains that the Commission's decision to rely on the FERC study was arbitrary. We disagree. The Commission explained that the trial staff study, based upon actual data reported to FERC on a monthly basis, accounted for differing coal quality, the age and duration of the contracts, and the contract size. *Id.* at 62,242. In contrast, the study submitted by the Power Agency's expert relied on unverifiable estimates of mining and transportation costs. *See FERC Order Denying Rehearing* at 61,529. The Power Agency points out that most of the comparable contracts included in the FERC study had been renegotiated rather than initially formed during the relevant time period, but the Commission reasonably concluded that these renegotiated contracts provided a meaningful comparison since the negotiating parties could be expected to reach a price near the market price at the time of renegotiation. *See FERC Opinion* at 62,243.

In sum, the Commission considered the Power Agency's criticisms and explained why, notwithstanding petitioner's concerns, it found the FERC study to be reliable evidence that these contracts were reasonably priced. The Commission's choice is in no way arbitrary, and is precisely the kind of exercise of discretion to which we defer. We therefore affirm the Commission's finding that Indiana Michigan did not violate section 205 of the Power Act by entering the AMAX coal contracts and passing through the full cost of those contracts to its ratepayers.

### III.

■ This brings us, then, to the two issues that do turn on the existence of a premium: petitioner's challenges under FERC's accounting regulation and the McDowell settlement. With respect to the former, the Power Agency contends that Indiana Michigan violated the FERC regulation governing a utility's "Fuel Stock" account—known as "Account 151"—which is designed to capture certain designated expenditures on fuel used to power the utility's generating facilities. *See* 18 C.F.R. pt. 101, Account 151 (1994). Like its statutory argument, the Power Agency's Account 151 claim rests on the proposition that the coal contract prices included a premium to offset the allegedly unreasonably high asking price for the Price River mines. Such a premium, the Power Agency argues, is not among the items identified as a permissible allocation to this account.

■ One answer the Commission gives to this argument is the same as its response under section 205 of the Power Act, namely, that even a contract price proven to contain a premium would not violate the Account 151 regulation so long as the price was reasonable under the market rate standard. *See FERC Opinion* at 62,245–46. But whether an expense was prudently or reasonably incurred under section 205 and can therefore be recovered from a utility's ratepayers and whether that expense may be included in Account 151 are different questions. Thus there are expenses which "while related to fuel and properly recoverable through the ratemaking process if prudently incurred, are not mentioned in Account 151 and there-

fore not properly assigned to that account." *Indianapolis Power & Light Co.,* 48 F.E.R.C. ¶ 61,040, at 61,201 (1989); *Minnesota Power & Light Co. v. FERC,* 852 F.2d 1070, 1072–73 (8th Cir.1988). For example, the Commission has refused to allow utilities to allocate several types of prudently incurred expenses to Account 151, including attorneys fees and litigation costs arising from efforts to reduce fuel supply costs; limestone used to reduce pollution from burning coal; audit fees incurred evaluating a coal supplier's annual invoice; and an adjustment related to a utility's acquisition of a fifty percent interest in rail cars used to transport fuel. *See Cities and Villages of Bangor v. FERC,* 922 F.2d 861, 863–64 (D.C.Cir.1991) (citing *Electric Coops. of Kansas,* 14 F.E.R.C. ¶ 61,176 (1981); *Minnesota Power & Light Co.,* 39 F.E.R.C. ¶ 61,192 (1987); *Indianapolis Power & Light Co.,* 48 F.E.R.C. ¶ 61,040 (1989); *Kansas City Power & Light Co.,* 42 F.E.R.C. ¶ 61,249 (1988)). In light of these precedents, we do not believe that a utility could assign to its Fuel Stock Account the full price of a contract which contained a "premium" to cover the cost of, for example, its acquisition of rail cars, even if that contract were priced reasonably near the relevant market rate for coal, without violating the Account 151 regulation. The Commission's broad pronouncement in this case that any invoice price within a reasonable range of the relevant market can be allocated to Account 151, however, would seem to allow just such a result.

■ Had the Commission relied on this proposition alone, we would have no choice but to remand for a more reasoned and thorough discussion of this departure from Commission precedent. But the Commission also rested its decision on its conclusion that the contracts did not contain a premium, a conclusion that, as we note above, is supported by substantial evidence. While the dissent maintains that the Commission failed to take into account evidence in the record that could be read to support the existence of a premium, we are satisfied that the Commission considered the entire record and that its finding is supported by substantial evidence, particularly in light of the market study showing that the contracts were priced

below the weighted average price of comparable contracts. Because we will "sustain an agency decision resting on several independent grounds if any of those grounds validly supports the result, unless there is reason to believe the combined force of the[ ] otherwise independent grounds influenced the outcome," *Carnegie Natural Gas Co. v. FERC,* 968 F.2d 1291, 1294 (D.C.Cir.1992), and because we have no evidence that the latter occurred, we affirm the Commission's finding that Indiana Michigan did not violate the Account 151 regulation.

■ We turn finally to the McDowell settlement. According to the Commission, the only Indiana Michigan generating facility expressly covered by the settlement agreement is the Tanners Creek 1–3 facility, the one contract the Power Agency did not challenge in its complaint. However, perhaps because the Commission was not entirely certain that the settlement's $75 million cap on the amount of the Price River amortization chargeable to wholesale ratepayers did not apply to ratepayers at Tanners Creek 4 and Breed, it went on to rule that even if the McDowell settlement did apply to the Tanners Creek 4 and Breed facilities, petitioner had not demonstrated a violation. *FERC Opinion* at 62,244–45. We sustain that ruling for the same reason that we affirmed the Commission's ruling on the fuel account regulations: the Commission's finding that the contract did not include a premium to offset the price paid for the mine is supported by substantial evidence.

For the foregoing reasons, we deny the petition for review.

*So ordered.*

WALD, Circuit Judge, dissenting:

Mindful of significant deference owed the Commission on the inferences to be drawn from disputed evidence, I nonetheless remain deeply troubled by the Commission's cursory treatment of a substantial amount of record evidence supporting the Power Agency's charges that Indiana Michigan entered into long-term coal supply contracts with AMAX at inflated prices in order to induce AMAX to purchase the Price River mines at their book

value. Thus, I would remand the case to the Commission for more adequate explanation of what I consider to be glaring pieces of evidence that point in the direction of the alleged "sweetened" contracts.

The gravamen of the Power Agency's charge is that Indiana Michigan included "sweeteners" in its long-term coal supply contracts with AMAX—and passed these costs along to ratepayers—in order to induce AMAX to buy the Price River mines at their book value. I first discuss the legal standard governing the alleged sweeteners. The Power Agency argues that such sweeteners, if proved, would violate the statutory requirement that rates be "just and reasonable," Federal Power Act § 205, 16 U.S.C. § 824d (1988), FERC's accounting standards, and the McDowell settlement. The majority concludes that while the alleged sweeteners would violate FERC's accounting regulations, and possibly the McDowell settlement, Majority Opinion ("Maj. op.") at 256, they are completely irrelevant to the Power Agency's statutory challenge: "if the market price study demonstrates that the coal contracts are reasonably priced our task is at an end, regardless of whether the contract rate includes a premium of some kind." Maj. op. at 252. In so doing, the majority takes the astonishing step of announcing an interpretation of the Commission's organic statute—with implications far beyond this case—that the Commission itself declined to adopt, turning the principle of *deference* to administrative agencies on its head. "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency." *Securities & Exchange Comm. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). By the same token, courts cannot use the review of an agency decision as an occasion to announce a rule of law not adopted by the Commission. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), unless we are dealing with the plain meaning of a statute, which we are plainly not,[1] we must defer to the agency's own reasonable interpretation, not announce our own. *See* 467 U.S. at 843, 104 S.Ct. at 2781–82.

Contrary to the majority, I am unable to discern from the Commission's opinion the position that the market price test would trump actual evidence of the alleged sweeteners. The logic of the Commission's opinion points in completely the opposite direction: the Commission determined that Indiana Michigan's coal purchase price withstood the Power Agency's statutory challenge *only* on the basis of its findings that that price passed *both* the market price and prudence test. *See, e.g.*, 65 F.E.R.C. ¶ 61,087 at 61,526 (the "contract price was not excessive when considered under *either* of these standards") (emphasis added). Thus, although the Commission undoubtedly placed great reliance on the market test, that reliance was never exclusive. Indeed, the Commission explained its understanding of the interrelation of the two tests quite clearly: "[I]f the price paid by the utility falls within the range of market prices for comparable goods . . ., it becomes *especially difficult* for the complainants to demonstrate imprudence." 62 F.E.R.C. ¶ 61,189 at 62,238 (emphasis added). It does not, however, per the Commission, become impossible to demonstrate imprudence. The Commission's prudence standard, in turn, is not mere surplusage; under settled Commission precedent, that standard is a direct interpretation of the statutory "just and reasonable" requirement. *See Michigan Power & Light Co.*, 11 F.E.R.C. ¶ 61,312 at 61,644–45; *see also Kentucky Utilities Co.*, 62 F.E.R.C. ¶ 61,097 at 61,197. Under the approach taken by the Commission in its opinion, then, Indiana Michigan's coal purchase contracts cannot pass the statutory "just and

---

1. The majority does not contend that the statutory requirement that rates be "just and reason-able" plainly means that a market price study is the final arbiter of rates.

reasonable" standard without passing the prudence test.[2]

Indeed, the Commission's own defense of its decision in briefs and at argument contradicts the majority's reading. At oral argument, Commission counsel repeatedly declined to take the position now adopted by the majority, instead characterizing the charges as "very, very serious." The court asked Commission counsel point blank:

> If we had absolute gold-plate proof that ... there was a sweetener in this particular deal ... but [the final price] somehow satisfie[d] the market price ... would there be any violation of ratemaking principles?

In response, as one member of the panel noted, counsel "filibuster[ed]," and, in the end, confirmed that the Commission required the contract prices to pass two separate tests—the prudence test and the market price study—before deeming them "just and reasonable":

> You've got ... one standard which basically did not in itself involve a market price analysis. And you know it's a loose standard. The Commission used that. It looked at ... the evidence of a sweetener. And then you use market price analysis in that context as corroboration.

2. The Commission's application of the prudence standard, in turn, reveals that proof of the alleged sweeteners would violate that standard. Although the Commission mentions that Indiana Michigan's "intentions" in setting the coal prices are not dispositive to the prudence analysis, 65 F.E.R.C. ¶ 61,087 at 61,527 n. 21, it devotes considerable energy to explaining that the repeated references by AMAX to "premiums" are "long-term" premiums rather than the inducement payments alleged by the Power Agency. This exercise, of course, would be entirely unnecessary if the alleged premiums met the prudence standard.

3. Although we have consistently accorded the Commission a high degree of deference in the economic modelling underlying its rates, see Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944), I have found no decision by the Commission or any court in which a market price analysis was found to trump actual evidence that wholly extraneous costs were allocated to a utility's supply purchase. When the 10th Circuit affirmed FERC's use of the market-price standard to evaluate whether transactions between affiliates are arms-length transactions, it

In sum, without considering whether the Commission is *required* to hold utilities to the prudence standard when it determines whether its rates are "just and reasonable," [3] it is enough for the moment that the Commission *does* hold utilities to this standard. It is, accordingly, the application of this standard to Indiana Michigan that we must review.

The critical question, then, is the factual one whether the long-term contracts included premiums to induce AMAX to complete the Price River mines purchase at Indiana Michigan's asking price.[4] The Commission points to selective evidence in the record to conclude that the only "premiums" involved in this transaction were premiums commonly included in long-term coal supply contracts over the spot market. To reach this conclusion, however, the Commission turns a blind eye to a great deal of evidence that the "premiums" in the long-term contracts were, in fact, designed to offset the inflated cost of the Price River mines.[5]

*First,* I find unconvincing the Commission's treatment of AMAX's own assessment of the transactions in its Management Presentation to the board. AMAX's presentation, based on "detailed feasibility studies and a comprehensive market evaluation of

did so only on "the record before us" in which the Administrative Law Judge "found ... no evidence suggesting anything improper." *Public Service Co. v. FERC*, 832 F.2d 1201, 1213–14 (10th Cir.1987) (internal quotations omitted).

4. Of course, this factual question is equally critical to the majority's disposition of the Power Agency's challenges based on FERC's accounting standards and the McDowell settlement.

5. At the time of the Commission's decision, some of the evidence was under seal. The Commission assured that it "reviewed protected portions of the record and f[ound] that they do not advance the Power Agency's cause," 65 F.E.R.C. ¶ 61,087 at 61,525. I realize that constraints on disclosure may have prevented the Commission from fully discussing some of the evidence identified by the Power Agency. Accordingly, as detailed below, I consider the Commission's discussion in briefs as well as in its published decision. (The relevant information has since been made public, and the Commission faced no constraints on its disclosure in brief.)

the Price River properties," 65 F.E.R.C. ¶ 61,087 at 61,526, concludes that the Price River mines component of the transaction has a *negative* net present value—that the expected income is less than half of the cost. Memorandum from J.A. Olsen to AMAX Management, Attachment 1, at 1 (September 3, 1985) ("Management Presentation"), *reprinted in* 2 Joint Appendix ("J.A.") 322, at 323. The presentation nevertheless recommends to AMAX's board that it enter the *linked* Price River mines and coal supply transactions on the basis of its "Summary of Transactions," in which it offsets the negative value of the Price River mines purchase with the positive present value of the long-term coal supply contracts. *Id.*

The Commission discounts this negative valuation of the Price River mines by AMAX's own management by noting that the negative valuation "reflects only 20 years of cash flow from the Price River mining operation, even though the evidence shows that the Price River reserve would support more than 35 years of mining. This fact led AMAX to conclude that the Price River properties contained 'significant upside potential', so much so that AMAX even considered mining a second seam at Price River." 65 F.E.R.C. ¶ 61,087 at 61,526 n. 18.

This reading of AMAX's valuation equation is a strained one indeed. In the course of its analysis of the transactions, AMAX's Management Presentation notes the possibilities mentioned by the Commission—that production could continue longer and more coal be exploited—and states that the projected earnings from the mines "could be surpassed." But it also expressly finds it "conceivable ... that [AMAX] could be unsuccessful in its attempts to profitably reactivate the Price River Mine," *i.e.*, it could end up with a totally worthless mine. Management Presentation at 4, *reprinted in* 2 J.A. at 326. Thus, AMAX recognized that, like any business investment, this one could do better or worse than expected. In the end, however, AMAX chose those "[p]rojected operating costs and realizations" for the mines that it "felt to be realistic" to arrive at the final values presented in its "Summary of Transactions." *Id.* And in this final analysis, AMAX concluded that the Price River mines purchase had a *negative value.* FERC's suggestion that AMAX *actually* decided to consummate the transaction on the basis of an unquantified and speculative "upside potential" that might bring the mines marginally closer to the black defies common sense.[6] The Management Presentation's recommendation that AMAX enter the transaction is based on the final analysis presented in the "Summary," under which the Price River Mines component of the transaction has a negative present value, offset only by the positive present value of the Coal Supply Agreements. It takes no law and economics maven to conclude that a business would not enter into a transaction assessed at a negative value absent countervailing benefits. In this case, the Power Agency argues that it was premiums in the linked, long-term contracts that made the transaction worthwhile, and the Commission has provided no persuasive alternative.

*Second,* FERC's response to statements in the record made by certain of the negotiators of the deal involving the Price River Mines and the coal supply contracts is equally discomfiting. Internal AMAX documents stating in no uncertain terms that the long-term coal supply contracts are set at a level to offset the cost of the Price River mines purchase pepper the record. One AMAX review, for instance, identifies possible questions and answers for the presentation of the proposal to the Board. In response to an anticipated question that the price of the mining property "seems awfully high," the memo suggests the following answer:

---

6. Indeed, FERC identifies as one source of the possible "upside potential" the fact that the mines could produce for 35 years rather than 20. Even if the projected income stream from year 20 to year 35 were included, it would not raise the value of the mines above their cost. The present value of the income from those later years of production would be significantly less than the present value of the first 20 years of production because it would be far more heavily discounted. As the present value of the *first* 20 years of income is itself less than half the present value of the cost of the mines ($26.7 million of $55.2 million in pre-tax dollars), inclusion of the next 15 years could not even approach making up the deficit.

First, the $175 million is to be paid over 20 years, so that its present value is near $50 million—a price not unreasonable when compared with other Utah properties that have sold recently. Second, *insofar as AEP* [7] *is concerned, this transaction has two aspects, the Utah acquisition and the coal supply agreements; any change in value for one would therefore be reflected in an offsetting change in the value for the other. Thus, a lower price for Utah would result in lower contract pricing.*

Memorandum from R.B. Meschke to W.R. Wahl, Attachment 2, at 1 (September 26, 1985), *reprinted in* 2 J.A. 361, at 368 (emphasis added).

The Commission does not even try to explain away this express understanding by AMAX's management officials that the price of the mines and the long-term coal supply contracts move in tandem. Instead, it simply dismisses the memorandum as the "statement of only one negotiator," which can "hardly [be] dispositive." FERC Brief at 37. Though certainly not "dispositive," this memorandum designed for the board's understanding of the deal deserves more than the Commission's cursory dismissal when there is an absence of any evidence advancing a different explanation.

Indeed, the Power Agency has pointed to not one but a string of internal analyses AMAX prepared over the course of negotiations with Indiana Michigan, all characterizing the long-term contract "premiums" as offsets to the cost of the Price River Mines, rather than the "premiums" for long-term coal supplies suggested by the Commission.[8] AMAX's "Mine Feasibility Study" of September, 1985, says:

AEP recognizes that on a fair market value basis [Price River Mines] worth consid-erably less than $140 million; therefore willing to include long term contracts as an offset to the consideration received from a purchase.

Memorandum from J.A. Olsen to W.R. Wahl, Attachment 1, at 1 (September 26, 1985), *reprinted in* 2 J.A. at 375.[9]

AMAX's review of December, 1985, states:

AEP would pay AMAX a permium [sic] on both midwest and compliance coal to cover the cost of the Price River lease. Premium payments and lease payments would be equated on a present value basis.

Memorandum from J.E. Schroder to R.B. Meschke at 1 (December 4, 1984), *reprinted in* 2 J.A. at 437.

And AMAX's transaction analysis of June, 1984, explains:

Coal Prices will be structured to include premium sufficient to reimburse AMAX and South East for plant, equipment, and reserve lease payments.

Memorandum from D.E. Coovert to R.B. Detty at 4 (June 1, 1984), *reprinted in* 2 J.A. at 417.

The Commission's only reply to this evidence is that "there is nothing at all unusual about a business anticipating profits from one of its transactions to pay for another transaction." FERC Brief at 40. But the cited memoranda suggest far more than AMAX's *anticipation* that "profits from one of its transactions [will] pay for another"; they state that the deal is being "structured" to accomplish this result through the use of premiums. These repeated and uncontradicted statements that the coal supply "premiums" are designed to offset the cost of the Price River Mine Purchase demand more than the casual attention given them by the Commission.

---

7. AEP is the parent company of Indiana Michigan.

8. Some of these documents describe earlier versions of the deal, but describe the same fundamental transactions. No party has suggested that the nature of the premiums shifted over the course of the negotiations.

9. FERC responds to this statement by singling out the assertion that the properties are "worth considerably less than $140 million," and con-cluding that this assertion does not support the conclusion that the properties are overpriced "because there is no indication whether that figure was premised on a direct sale, lease, or other financial arrangement." FERC Brief at 36. This response sidesteps entirely the point of the statement—made after the transaction was in its final form—which is that *because* the properties are overpriced, Indiana Michigan will include the long-term contracts.

Finally, FERC's finding that *all* of the "premiums" were simply long-term premiums is flatly contradicted by concrete record evidence. The Commission's decision "find[s]" categorically "that the 'premiums' or 'net revenues' mentioned in the AMAX documents simply refer to how much more money AMAX would earn by selling the coal to [Indiana Michigan] on a long-term contract basis rather than selling the coal on the spot market." 65 F.E.R.C. ¶ 61,087 at 61,-527.

As to *some* of these "premiums," however, the Commission is clearly wrong. The "'premiums' or 'net revenues' mentioned in the AMAX documents" were included in long-term contracts at Breed, Tanners Creek 1–3, and Tanners Creek 4. Although the Power Agency does not, in the end, challenge the pricing at Tanners Creek 1–3, it has pointed to record evidence that for these contracts AMAX *expressly* calculated the "net revenue"—the premium—from the baseline of a long-term contract. Under the mutual arrangements for the Tanners Creek 1–3 long-term coal supply contracts, AMAX *buys* coal from a third party on a long-term contract and then turns around and sells it to Indiana Michigan on a long-term contract. *See* Management Presentation at 6–7, *reprinted in* J.A. at 328–29. The calculated premium is *between* these two long-term contracts and most definitely not between a long-term and a spot market contract. *See id.*[10]

FERC does not dispute this analysis of the premiums in the Tanners Creek 1–3 contracts, but provides the "simple answer" that the Tanner's 1–3 premiums are "irrelevant" because those contracts are not challenged by the Power Agency. FERC Brief at 39. Though the Tanners Creek 1–3 contracts are assuredly not "directly at issue," *id.*, they *are* part of the same transaction between AMAX and Indiana Michigan and—in combination with the other evidence—strongly suggest inferences about the intent underlying the related "premiums" in the Breed and Tan-

ners Creek 4 contracts. The Commission's disposal of this uncontradicted evidence that the premiums in the Tanners Creeks 1–3 contracts were *not* long-term premiums is far too breezy.

As we have often repeated, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In concluding that the only "premiums" in the deal between Indiana Michigan and AMAX were premiums for long-term coal, the Commission has failed utterly to take into account large portions of the record "detract[ing] from [the] weight" of this conclusion and pointing strongly toward a contrary conclusion that the deal did indeed involve inducement premiums for the sale of the mines as alleged by the Power Agency. Given the force of this counter evidence, I believe the Commission had an obligation to answer it directly and, if it could not, to change its own result and hold for the Power Agency. On the ground that the record in its present state does not in the end provide the "substantial evidence" necessary to validate the Commission's decision, I respectfully dissent.

---

10. Further, when the total tonnage for Tanners Creek 1–3 changed from 600,000 to 800,000, AMAX stated: "On our calculation we must figure what we have to charge for this coal in order to obtain the same value that we previously calculated at 600,000." Memorandum from P.M.

Garson to T.M. Blangiardo and R.B. Meschke at 1 (March 8, 1985), *reprinted in* J.A. at 474. This statement that the premium would remain constant regardless of the amount of coal delivered conflicts with FERC's conclusion that the premium is long-term v. spot market premium.