**IROQUOIS GAS TRANSMISSION SYSTEM, L.P., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Iroquois Non–Owner Shipper Group, et al., Intervenors.**

No. 98–1081.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1999.

Decided April 13, 1999.

Lee A. Alexander argued the cause for petitioner. With him on the briefs were Beth L. Webb, Stefan M. Krantz and Jeffrey A. Bruner.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Kevin J. McKeon argued the cause for intervenors. With him on the brief were Lillian S. Harris, Mary Ann Walker, Neil L. Levy, David W. D'Alessandro, Kelly A. Daly and Richard A. Rapp, Jr.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Iroquois built a pipeline to bring gas from the United States–Canadian border down to the New York City region. The pipeline was so constructed that its capacity could be expanded rather cheaply; adding compressor stations would (or at least

could) bring down average cost. In early 1996 Iroquois held an auction to find out whether demand was strong enough to justify such an expansion. At the time its maximum tariff rate was $0.695/dekatherm ("DTh"). Iroquois set the minimum bid for the additional capacity at $0.50/DTh, which it says without contradiction is the minimum rate at which it could recover the cost of building the compressor and yield a surplus that could be used to reduce rates for existing shippers. The only shippers submitting viable bids that met the $0.50 threshold were Coastal Gas Marketing Co. and ProGas U.S.A., Inc., which bid $0.50 and $0.54, respectively, for the new service.

Iroquois applied in mid–1996 for the certificate of public convenience and necessity required for construction of the compressor station. It proposed use of the auction rates for the new shippers, and, as we understand from oral argument, committed in the application to include a modest reduction in rates for the earlier shippers—not down to the auction levels—in its next rate case under § 4 of the Natural Gas Act, 15 U.S.C. § 717c. The Federal Energy Regulatory Commission issued a certificate in mid–1997, see *Iroquois Gas Transmission System, L.P.*, 79 FERC ¶ 61,394 (1997), but denied Iroquois's request to discount the rates below those charged existing shippers. Iroquois petitioned for rehearing on the discount issue, FERC denied the petition for rehearing, see *Iroquois Gas Transmission System, L.P.*, 82 FERC ¶ 61,086 (1998) (*"Order on Rehearing"*), and this appeal followed.

While this appeal was pending, Iroquois accepted the certificate and constructed the facilities. While construction proceeded, a FERC rate order reduced the *maximum* tariff rate to $0.46/DTh, below the rejected discount price. See *Iroquois Gas Transmission System, L.P.*, 84 FERC ¶ 61,086 (1998), *reh'g denied in relevant part*, 86 FERC ¶ 61,261 (1999). On November 2, 1998 Iroquois began service to Coastal and ProGas at the new maximum rate.

\* \* \*

The Commission argues that Iroquois is not "aggrieved," as required for our jurisdiction both under the Constitution and the statute. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding "injury in fact" element of "irreducible constitutional minimum" for standing); 15 U.S.C. § 717r(b) (providing that any party "aggrieved by an order issued by the Commission" may obtain judicial review). Two of the theories of non-aggrievement are frivolous. First, FERC suggests that because Iroquois objects to a floor under its rates rather than a ceiling over them, it suffers no injury. This seems to rest on the assumption that a firm can always increase its profits by raising prices—a proposition which, if true, would cause every firm to charge an infinite price.[1] The second frivolous theory is that because Iroquois accepted the certificate, it follows that it is not harmed. But in practical terms it seems self-evident that a firm may be worse off (or may reasonably perceive itself as worse off) under a conditioned certificate than under the same certificate without conditions. Its acceptance of the conditioned certificate may show that it would be still worse off with no certificate at all, but that comparison is irrelevant. We have in fact previously heard the claims of parties who accepted conditioned licenses from FERC and objected to the conditions. See *Transcontinental Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 895–96 (D.C.Cir.1995).

More serious is FERC's argument that the rate order mentioned above, reducing the maximum rate to less than the proposed discount rate, removed any effective injury. FERC has not worded this theory

1. Agency briefs sometimes seem to contain ideas that would not see the light of day if there were any consultation between the brief writers and the agency's policy staff. This appears to be such.

as one of mootness, though it appears in effect to be such a claim: a supervening event has, in FERC's theory, rendered the apparent injury a nullity. Yet FERC itself seems unready even to assert the factual prediction necessary for this to be true. At oral argument it was unwilling to say that the rate order established mootness, evidently sharing Iroquois's belief that there is considerable probability that over the course of the current contracts the contested no-discount ruling will constrain Iroquois. Indeed, such constraint seems highly probable, perhaps certain. Iroquois contemplates additional compressor stations like the one whose addition precipitated this dispute. The ability to price the additional capacity incrementally—to set rates for newly available service higher than incremental cost but lower than those for existing shippers—seems likely to be extremely valuable to Iroquois in its efforts to exploit the business opportunities inherent in such capacity expansions. See *Great Lakes Gas Transmission v. FERC*, 984 F.2d 426, 430–31 (D.C.Cir.1993) (pipeline presently injured by "at-risk" condition in certificate because of impact on negotiating strategy).

On the merits, it is common ground that the Commission has embraced the theoretical soundness of allowing certain kinds of rate discounting and has in fact formally approved such discounting, both in the form of generic grants of authority and in specific cases. See FERC Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol, ("Order No. 436"), 50 Fed.Reg. 42,408, 42,451–55 (1985); *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1009–13 (D.C.Cir.1987); *Southern Natural Gas Co.*, 67 FERC ¶ 61,155 at 61,456 (1994) (on rehearing); see also Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines, 74 FERC ¶ 61,076 at 61,238–42 (1996) (expressing Commission readiness to entertain, on a shipper-by-shipper basis, requests to implement negotiated rates, even where the pipeline has market power,

where customers retain the ability to choose cost-of-service based tariff rate). Pointing to *Southern*, Iroquois argues that FERC's controlling principle has been that if a competitively justified discount transaction will benefit the non-discount customers by bringing about reduced rates for the capacity they use, FERC will approve the discount. FERC's contention is that Iroquois's application for a certificate presented a completely new problem, that of injury to existing customers as sellers in end-use markets; thus, it says, *Southern* and its other pro-discounting acts are in no way precedents against its decision here. We will return to this, the core issue, after briefly pursuing a preliminary substantive matter.

The parties dispute the extent to which a pipeline in Iroquois's position, seeking certification of new construction and of service on a discounted basis, must demonstrate a competitive necessity for the discounts. But we cannot read the Commission's decision here as resting on any deficiency in Iroquois's showing on this score. Iroquois initially relied primarily on its having conducted an auction for the proposed new capacity and having received no viable bids higher than $0.54/DTh. (Although some shippers placed higher bids, they were not willing to execute the required precedent agreements.) See *Iroquois Gas Transmission System, L.P.*, 79 FERC ¶ 61,394 at 62,690. It argues that this shows that competitive forces of some sort, such as other pipelines transporting gas to the area of destination, or the availability of alternative fuels in the area of destination, have in fact driven the maximum extractable price down to that level. The Commission's brief argues that the Commission insists, and is entitled to insist, on proof of competition from *pipelines* (without explaining why that affects the case for discounting). Iroquois responds that FERC has said that it was a "reasonable presumption that a pipeline will always seek the highest possible rate from non-affiliated shippers," *Williams Natural Gas Co.*, 77 FERC

¶ 61,277 at 62,206 (1996), and has explicitly recognized that an auction helps "to ensure that prices reflect competitive market forces," Notice of Proposed Rulemaking, Regulation of Short–Term Natural Gas Transportation Services, 63 Fed.Reg. 42,-982, 42,998/2 (1998).

In the end, however, the Commission's disposition of Iroquois's petition for rehearing refutes its claim that some deficiency in the showing of competition was determinative. With its petition for rehearing Iroquois proffered evidence of competition from another pipeline, and the Commission declined to accept it—*not* on some theory that it was too late in the game to offer such evidence, but on the ground that the affidavits were "immaterial." *Order on Rehearing*, 82 FERC at 61,334 n. 14. Indeed, the body of the Commission's order contains no attack on Iroquois's showing of competitive forces and appears to rest entirely on other grounds.

The heart of those other grounds appears to us as follows: First (and most critically), the diminutive drop in the rates to be paid by the non-discount shippers (according to our back-of-the-envelope calculations, perhaps 0.5 to 1 percent at most) is overwhelmingly offset by the injury that they would suffer in end-use markets, being exposed to competition from new shippers who would benefit from considerably lower transportation costs. Second, the Commission regards this impact as particularly unjustifiable because it was the existing shippers' commitments that made construction of the pipeline possible. And, it said, at the time the commitments were made

> there was much less potential for competition between marketers of gas and LDCs [local distribution companies] and the Commission's regulations and policies would not have offered these Iroquois shippers the opportunity to assure by contract negotiation that the benefits

of the cheap expansibility of the system would accrue to them.

*Id.* at 61,335.

Each of these theories seems vulnerable. First is the asserted assumption of the irrelevance of end-use market competition in prior cases. Shippers do not have gas carried around aimlessly; they have it carried in order to *sell* (or use) it at the point of destination. Iroquois accordingly argues that these competitive impacts have, presumably, been pervasive. Except to the extent that discounts may have been based on a specific class of end-users having a more elastic demand, gas carried for new shippers at lower cost than for existing shippers would seem sure to fill demand that the latter would otherwise have filled, or had a chance to try to fill, in the absence of the new discounted service. When the shippers in *Southern* objected before the Commission to a proposal that (as here) *lowered* their transport costs (but enabled new shippers to ship at even better rates), their objection seems likely to have been based on the impact in the end-use market. In the *Order on Rehearing* the Commission addressed this issue only in the following passage:

> Discounting does not *always* have the effect it would in this case, where [1] the expansion shippers would be competing in the existing shippers' markets and [2] the existing shippers are the very ones who made the cheap expansibility of the pipeline possible.

*Id.* at 61,334 (emphasis added).

The force of this answer seems uncertain. First, it is unclear just how the non-competitive relation referred to in the first explanation would come about. The incremental gas will be shipped only if it can be sold in the destination market, and it would seem, therefore, most likely to compete either for sales previously being made by, or potentially to be made by, the existing shippers. But even if entirely true, the assertion that discounting does not "always" involve the discount shippers competing in the existing shippers' market

is rather weak—perfectly consistent with the intuitively plausible proposition that it does so in the mine run of cases. Thus it does not really contradict Iroquois's contention that the Commission's standard view in favor of discounts was indifferent to (or even enthusiastic about) the prospect of additional competition in the end-use market.

Nor, as a matter of logic, is it apparent how it will not universally be the case that the expansion shippers will be using capacity made possible by the existing shippers. A non-cost-based discount seems by definition to mean that the favored shippers make a smaller unit contribution to covering the fixed costs of capacity than do the disfavored ones. See *Southern Natural Gas Co.*, 67 FERC at 61,456–57 (rejecting contention that there is necessarily any improper cross-subsidization from competition-based discount, even though customers' unit contributions to fixed costs differ). We do not understand how in this respect the present case is different from the universal case in any economically material way.

Let us return to the Commission's discussion of changes in competition and regulatory environment since the existing shippers negotiated their contracts in the '80s: [2]

> At that time [when the existing shippers came onto the system], there was much less potential for competition between marketers of gas and LDCs, and the Commission's regulations and policies would not have offered these Iroquois shippers the opportunity to assure by contract negotiation that the benefits of the cheap expansibility of the system would accrue to them.

*Order on Rehearing*, 82 FERC at 61,335.

We inquired at oral argument just what regulatory obstacles there may have been to contract clauses assuring treatment at least as favorable as any other shipper. Petitioner unsurprisingly denied that any record evidence showed that barriers existed, and neither Commission nor Intervenors' counsel contradicted him or explained what such barriers might have been. As to the difference in competitive environment, we do not doubt that with Order No. 636 and kindred actions the Commission has advanced the role of competition in the industry. But Order No. 436 embraced the desirability of gas-on-gas competition, see 50 Fed.Reg. 42,411/2 (claiming order "secures to consumers the benefits of competition in natural gas markets"); see also *id.* at 42,453/1 (noting that discounting enables pipelines to compete with each other and respond to commodity traders), and also explicitly favored value-of-service discounts, *id.* at 42,453/1–2, so to the extent that the Commission suggests that parties negotiating in the wake of Order No. 436 could not have anticipated competition between marketers and LDCs, we think more detailed explanation is in order.

In short, the Commission appears to have treated Iroquois's proposal as a special case by noting characteristics that appear in their essence to hold true for a wide range of discounted service. And in suggesting that it was merely filling in a contract clause that the parties would have arrived at had they anticipated the issue and been able to deal with it contractually, FERC has not explained either why they would not have anticipated it, what obstructed a contractual resolution, or why FERC believes the parties would have arrived at the hypothesized provision if they had foreseen and been able to address the problem.

At oral argument and in the briefs a number of additional arguments were

---

2. The deal appears to have been closed in the very late '80s. A 20–year agreement among New York shippers, New Jersey shippers, Iroquois, and Texas Eastern was evidently executed January 25, 1989. See *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091 at 61,351 n. 31 (1990). It is not clear whether that is the pertinent date for these purposes.

mooted that could not be a basis for affirmance because they were never suggested by the Commission in its orders. See *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 950 (D.C.Cir.1999) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). Nor, for the reasons discussed below, do they seem to help us discern the Commission's likely path. Cf. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (upholding decision because agency's "path may reasonably be discerned," despite explanation of "less than ideal clarity.").

The Intervenor suggests a distinction between existing shippers being exposed to competition in "new" end use markets (which counsel appeared to acknowledge as common in prior situations) and their being exposed to competition in old ones (the present case). It is not clear why such a distinction would make a principled difference. If the Commission relied on such a distinction it would need to explain why end-users served by existing shippers should be denied the benefits of competition while new end-users may enjoy its benefits.

Intervenor also alluded to a possible distinction between using discounts to fill existing capacity (prior situations) and using them to fill new capacity that can be added at a cost lower than the resulting incremental revenue (current situation). See Intervenor Br. at 24, Oral Arg. Tr. 31–34. Yet on the surface in both cases the discounts seem to address essentially the same problem—that of neglected profitable opportunities. Again the force of the distinction is obscure.

We note that classic analysis of non-cost-based discounting by carriers has turned on differences in the price-elasticity of demand for the carried product. It pursues the goal of an optimal trade-off between the desirability of maximizing output and the necessity of the utility's recovering all its costs. See Order No. 436, 52 Fed.Reg. at 42,453; *Associated Gas Distributors*, 824 F.2d at 1010–11. It may be that where the only differences between the shippers are (1) time of signing up for the service, and (2) contractual commitment of the customers who signed up early, the standard analysis is in some way inapplicable.[3] But the Commission has not advanced such a theory of inapplicability, nor has it made clear the relation between its order here and prior policy. We do not at this stage know if the Commission's decision is a response to a true novelty (and if so in what the novelty lies), or if it is a change in response to some new understanding of the situation (and if so, what the new understanding may be).

Because the Commission decision does not clearly enough reveal its grounds for judicial review to be meaningful, see *Chenery*, 318 U.S. at 87, 63 S.Ct. 454, the case is remanded to the Commission.

*So ordered.*

---

**3.** We have recognized that in a situation where increasing volume *raises* unit costs, each customer's contribution to the peak load "causes" the associated costs, regardless of whether it is a new customer adding load or an old one not cutting its load. *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 951–52 (D.C.Cir.1999) (quoting *Town of Norwood v. FERC*, 962 F.2d 20, 24 n. 1 (D.C.Cir.1992)). Superficially, this case appears the converse: putting aside the contract point, the new shippers' load does not seem to "enable" the pipeline to attain the lower unit costs anymore than does that of the earlier shippers. Thus there does not seem to be a cost-based theory for the discount.